

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-23-00242-CV
_____

FOOD LAB, LLC D/B/A US FOOD LAB AND
MARCOS BENAVIDES, INDIVIDUALLY, APPELLANTS

V.

PULMONAIR, LLC, APPELLEE

On Appeal from the 166th District Court
Bexar County, Texas
Trial Court No. 2021-CI-05066, Honorable Laura Salinas, Presiding

July 11, 2024

MEMORANDUM OPINION[1]

Before QUINN, C.J., and PARKER and YARBROUGH, JJ.

Food Lab, LLC d/b/a US Food Lab and Marcos Benavides (Benavides) appeals from the final judgment in favor of Pulmonair, LLC. The latter had sued the former under a myriad of causes of action, including breach of contract, fraud, and deceptive trade practices. Each arose from the non-delivery of N95 masks sought through Benavides and paid for by Pulmonair. Through three issues, Benavides contends 1) the jury findings

_____

[1] Because this matter was transferred from the Fourth Court of Appeals, we apply its precedent when it conflicts with that of the Seventh Court of Appeals. TEX. R. APP. P. 41.3.

of fraud and deceptive trade practices lacked legally and factually sufficient evidentiary support, 2) Benavides could not be found liable personally since he acted as the agent of his solely owned Food Labs corporation, and 3) deficient evidence supported the award of exemplary damages.  We affirm.

### Background

This case involves an agreement between Pulmonair and Benavides under which the latter was to provide N95 masks during the Covid-19 epidemic.  In March 2020, Pulmonair needed to acquire a large number of them to service its customers.  To obtain them, Pulmonair contacted (through its owner Raimondo) Benavides, the owner of Food Lab.  Raimondo sought a registered importer for Pulmonair so that he could obtain masks from other countries and bring them into the United States.  That contact resulted in Raimondo and Benavides engaging in numerous communications and texts.

Through same, Benavides informed Raimondo that his company Food Lab had masks available and could deliver them in short order.  Yet, Food Lab was not in the business of selling medical equipment, did not sell masks, and did not have freight forwarding authority.  Indeed, it simply sold Mexican food products like tortillas.  Nor did it have a ready source for such masks and instead turned to unsolicited fishing emails, one of which was from Medi Waves.

Nevertheless, representing that he had a trusted source, Benavides induced Pulmonair to place orders and invoiced the company for same.  Though Pulmonair eventually deposited $500,000 with Benavides and Food Lab, it never received any masks.  Indeed, Benavides would come to admit that he and Pulmonair were defrauded by Medi Waves, the entity from which Benavides would purportedly acquire the masks.  Interestingly, Benavides was alerted to Medi Waves being a fraudulent company by Wells

2

Fargo after the latter returned an initial wire transfer Benavides had sent to Medi Waves. Benavides did not inform Pulmonair of this but, instead, continued to invoice the buyer for additional sales. Ultimately, Benavides returned all but $126,000 of Pulmonair's money.

### *Issue One—Sufficiency of the Evidence*

By the first issue, Benavides asserts neither legally nor factually sufficient evidence supported the jury findings that both he and Food Labs committed deceptive trade practices. We overrule the issue.[2]

The applicable standards for review were discussed in *Lowry v. Tarbox*, 537 S.W.3d 599, 605-06 (Tex. App.—San Antonio 2017, pet. denied). We utilize them here.

Benavides argues that all Pulmonair's damages were due to the fraudulent acts of Medi Waves and therefore, there "does not exist a fact pattern in which the Texas Deceptive Trade Practice[s] Act is, as alleged by Appellee . . . a proper theory of recovery that would apply."

To recover under the Deceptive Trade Practices Act, a plaintiff must establish: 1) it is a consumer; 2) the defendant engaged in false, misleading, or deceptive acts; and 3) these acts constituted a producing cause of the plaintiff's damages. *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 478 (Tex. 1995) (citing TEX. BUS. & COM. CODE § 17.50)). At issue here is whether Food Lab and Benavides engaged in false, misleading, or deceptive acts.

The trial court, through its charge, itemized the categories of deceptive trade practices in play. They included: 1) "[c]ausing confusion or misunderstanding about the

---

[2] Much of what Pulmonair said in response to Benavides's issue dealt with the accuracy of the trial court's jury charge. Yet, Benavides did not question the charge's accuracy.

source, sponsorship, approval or of goods or services," TEX. BUS. & COMM. CODE § 17.46(b)(2); 2) "[c]ausing confusion or misunderstanding about affiliation, connection, or association with or certification by another," *id*. at § 17.46(b)(3); 3) "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are not," *id.* § 17.46(b)(7); 4) "[r]epresenting that an agreement confers or involves rights, remedies, or obligations that it does not," *id.* at § 17.46(b)(12); and 5) "[f]ailing to disclose information about goods or services that was known (or could have been known). at the time of the transaction." *Id.* at § 17.46(b)(24).

Here, the record shows 1) Pulmonair and Benavides had previously transacted business; 2) Pulmonair asked Benavides for a referral to someone capable of selling the needed N95 masks; 3) Pulmonair asked for a referral to a company qualified by the Food and Drug Administration to sell approved masks; 4) Benavides represented his company (Food Lab) could sell him the masks; 5) responding to an unsolicited email from Medi Waves, Benavides utilized that entity as a source for the masks; 6) neither Benavides nor Food Lab had previously transacted business with Medi Waves; 7) Benavides did not inform Pulmonair of its purported source for the masks; 8) Pulmonair placed an initial order of 10,000 masks with Benavides and Food Lab and sent the latter funds to cover the purchase; 9) Benavides wired, through Wells Fargo, approximately $12,000 to Medi Waves to cover his or Food Lab's acquisition of same from Medi Waves; 10) Wells Fargo returned the payment with notification that "the bank account used by Medi Waves had been flagged for fishing"; 11) Benavides knew "fishing" involved fraud; 12) Benavides withheld this information from Pulmonair and invoiced Pulmonair for an additional $200,000 even though he "knew there was a problem" with Medi Waves; 13) knowing there was a problem, Benavides "still chose . . . to wire funds overseas" to Medi Waves;

4

14) Benavides sent pictures or videos of the masks purportedly sold to Pulmonair being loaded on a truck in preparation for delivery coupled with urging to buy more; 15) Benavides admitted it fell upon him and Food Lab to do due diligence with regard to Medi Waves's legitimacy and little if any was done; 16) Benavides agreed that he could not sell product he did not own; 17) Benavides told Pulmonair that he was selling the masks; 18) Benavides represented before the initial orders that "we already did all the research and . . ." the masks were coming from a trusted supplier; 19) Benavides represented the masks would be "air-shipped" to Pulmonair; 20) Benavides represented that he had certification that the masks were 3M product; 21) Pulmonair believed Benavides lied about items being shipped; 22) Pulmonair would not have placed more orders had Benavides disclosed the Wells Fargo warning about potential fraud; 23) Pulmonair was "relying on [Benavides's] 20 years of expertise in importing and selling goods"; 24) Pulmonair relied on Benavides's representation that the monies sent by Pulmonair would be held in escrow pending delivery of the goods; 25) monies were not so held in escrow pending receipt of the masks but rather disbursed to Medi Waves; and 26) despite paying over $500,000 to Benavides for masks, none were received.

At the very least, Benavides's failing to tell Pulmonair that he discovered Medi Waves through an unsolicited fishing email and that Medi Waves had been flagged as a fraudulent vendor while continuing to invoice Pulmonair for additional sales permitted a rational juror to reasonably infer the existence of a deceptive act within § 17.46(b)(24). The same is true of the failure to tell Pulmonair that no due diligence was conducted regarding the legitimacy of Medi Waves or its product despite telling Pulmonair a trustworthy source had been found. Both also provided some evidence of Benavides and

5

Food Lab "[c]ausing confusion or misunderstanding about the source . . . of goods or services."

It can also be said that the jury had before it some evidence of a deception concerning the non-disclosure of information about the quality and extent of services offered by Food Lab. Benavides told Pulmonair that Food Lab could acquire the medical products while knowing it only imported Mexican food, such as tortillas. Furthermore, we find evidence of actionable deceit in Benavides's 1) providing videos or pictures to show prior orders had been shipped to Pulmonair when they had not, 2) using those photos to induce additional orders, and 3) disbursing funds to Medi Waves despite representing that monies would be held in escrow pending receipt of the product.

Though we could continue to plug the evidence into various categories of deceptive activities, the foregoing suffices to support the jury's finding under attack. That body had before it some evidence enabling reasonable and fair-minded people to conclude that Benavides and Food Lab committed deceptive acts within the scope of § 17.46(a) of the Deceptive Trade Practices Act. *See* TEX. BUS. & COMM. CODE § 17.46(a) (stating that "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful and are subject to action . . ."). And, the evidence supporting those findings was not so weak as to make them clearly wrong and manifestly unjust.

**Issue Two—Personal Liability**

Via his second issue, Benavides claims he could not be held liable personally for the deceit practiced as an officer or agent of Food Lab. We overrule the issue.

A corporation's agent is personally liable for his own fraudulent or tortious acts, even when acting within the course and scope of his employment. *Keyes v. Weller*, No.

6

22-1085, ___ S.W.3d ___, ___, 2024 Tex. LEXIS 548, at *1 (Tex. June 28, 2024); *Sanchez v. Mulvaney*, 274 S.W.3d 708, 712 (Tex. App.—San Antonio 2008, no pet.)*; see Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002). So, "if there is evidence that the agent personally made misrepresentations, then that agent can be held personally liable." *Id.* And, there is evidence Benavides personally made misrepresentations to Pulmonair, as illustrated above. And, contrary to his argument, it mattered not whether he did so to directly benefit himself under § 21.223 of the Texas Business Organizations Code. As said in *Keyes*, "we do not understand Section 21.223 to shield a corporate agent who commits tortious conduct from direct liability 'merely because the officer or agent also possesses an ownership interest in the corporation.'" *Keyes*, ___ S.W.3d at ___, 2024 Tex. LEXIS 548, at *16.

### *Issue Three—Exemplary Damages*

Through the last issue, Benavides contends that insufficient evidence supported the award of exemplary damages. Allegedly, neither he nor Food Labs "intentionally or knowingly" committed the fraud in question. We overrule the issue.

The trial court directed the jury to answer question 12 if it answered "yes" to either questions 5 or 6. Question 5 dealt with active fraud through misrepresentation; that is, the trial court asked if Food Lab and Marcos Benavides committed fraud against Pulmonair "by making a false statement or fact, regarding the sale of masks to Pulmonair . . . ? Through question 6, the jury was asked if Food Lab and Benavides "commit[ted] fraud by nondisclosure against Pulmonair . . . ?" The jury answered "yes" to both questions. Thus, it was obliged to answer Question 12. And, through it, the trial court asked the jurors to determine "[w]hat sum of money, if any, in addition to actual damages should be awarded to Pulmonair . . . because the [conduct of] Food Lab and/or

7

Marcos Benavides[] was committed knowingly or intentionally." They answered $120,000.

At the very least, Benavides's, singularly and on behalf of Food Lab, 1) representing he had done due diligence on Medi Waves when he had not, 2) representing Medi Waves was a trustworthy source of masks when he actually conducted no due diligence into the company or its product, and 3) continuing to invoice Pulmonair for masks from Medi Waves while knowing and withholding disclosure that Medi Waves had been flagged as a fraudulent vendor are some evidence of knowingly engaging in fraud sufficient to support the answers to questions 5 and 6, respectively, and question 12.[3] And, that evidence is not so weak as to make the finding clearly wrong or unjust. So, it has the support of both legally and factually sufficient evidence.

Having overruled each of appellants' issues, we affirm the judgment of the trial court.

Brian Quinn
Chief Justice

---

[3] The trial court defined "knowingly" as "actual awareness, at the time of the conduct, of the falsity, deception, or unfairness of the conduct in question or actual awareness of the conduct. Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness." And, again, no one questioned the accuracy of the charge.